THE STATE v. HUFF, Appellant.

Division Two, March 26, 1901.

161    459
165    353
166    237
161      459
168    ²522
161      459
171    ² 59
e171   ² 60

1. **Rape**: SUFFICIENCY OF EVIDENCE. Prosecuting witness in a trial for rape testified that accused, her stepfather, came home at night and ordered her and her sister, a child of nine years, to dress and mount a horse with him to go to the nearby village, where he intended to shoot her mother and sister; that after proceeding part of the way, he returned and took witness into the barn; that afterwards he took her into the house and sent her and her sister upstairs, and shortly after, while they were screaming, by means of threats, and in the presence of her sister, ravished witness; that he had done the same in the barn; that the next day she made complaint; that a month later she was married, and the next day she and her husband started overland in a wagon, and were later joined by accused, who traveled with them in the wagon for some time, and finally she wrote to the sheriff, and he came and arrested accused. Witness contradicted herself in many ways. The alleged offense occurred in a thickly-peopled village, and next door to an inhabited house. Two neighbors testified to hearing screams of children on the night in question,

but neither investigated the matter. Physical examination of prosecuting witness by physicians revealed that the crime might have been committed., The witness was impeached by several witnesses, most of them relatives of accused, who testified that she stated to them that accused had never committed the crime, but that her sister had concocted the scheme to cause a separation between accused and their mother. An attorney testified that she had admitted to him that accused had not committed the offense. *Held*, that a conviction was not justified.

2. **Evidence:** HEARSAY. Testimony of prosecuting witness that a person "representing accused" attempted to induce her not to testify, is incompetent, as being a legal conclusion and hearsay.

3. ———: ———: REVIEWED ON APPEAL. Where evidence is incompetent and hearsay, its admission can be reviewed on appeal under general objections.

4. **Subpoena:** RETURN: SERVICE IN ANOTHER STATE. A subpoena is inadmissible where its return shows service in a county in another State.

5. ———: ———: SIGNED BY SPECIAL DEPUTY: INVALID. A return of service of a subpoena signed by a special deputy in his own name is invalid.

6. **Evidence:** LACK OF DILIGENCE IN SECURING WITNESS. Testimony of a witness that he saw a certain State's witness at his home a few days before the trial is admissible to show the State's lack of diligence in securing his attendance.

7. ———: AS TO OWNER OF TEAM: NO CHARGE OF ELOIGNMENT. Accused not being charged with eloigning the prosecuting witness, it was error to admit evidence that accused owned the team and wagon in which the witness left the neighborhood.

8. ———: AS TO OWNER OF FARM: IRRELEVANT. It is irrelevant to show whether accused or his wife owned the farm occupied by them, how much it sold for, and whether the wife had not mortgaged her property to secure the fees of accused's counsel.

9. ———: PROSECUTING WITNESS MADE TO LEAVE NEIGHBORHOOD: INCOMPETENT. Evidence that a prosecuting witness was made to leave the neighborhood by persons other than accused is incompetent.

State v. Huff

10. ———: ———: NAMES OF PARTIES: ERRONEOUSLY EXCLUDED. Conceding that it was competent for prosecuting witness to testify that she was made to leave the neighborhood, it was error to exclude further questions eliciting the names of those who made her go.

11. ———: AS TO BOND FOR APPEARANCE: INCOMPETENT. Evidence of prosecuting witness that she made no objection to being placed under bond for her appearance at court, and that she was glad, because she was afraid to leave the jail, is incompetent.

12. Appellate Practice: FAILURE TO INSTRUCT: NO EXCEPTIONS. Objections can not be considered on appeal that the jury were not instructed as to certain points, there being no exceptions saved to such failure to instruct.


Appeal from Pike Circuit Court.—*Hon. D. H. Eby,* Judge.


REVERSED.


*James O. Barrow* and *Pearson & Pearson* for appellant.


(1)   There is no evidence in this case to support a verdict for rape.   (a)   To support a verdict of conviction for rape there must be proof of force used on the part of defendant, or intimidation; and of the utmost resistance on the part of the prosecuting witness.   R. S. 1889, sec. 3480; State v. Burgdorf, 53 Mo. 65; State v. Perkins, 11 Mo. App. 82.   (b)   Prosecuting witness was not corroborated.   "The prosecutrix, in a trial for rape must be corroborated and when her testimony as to the perpetration of the alleged offense is explicitly contradicted by the defendant, thus creating an equipoise of oath against oath, the evidence will be insufficient to support a verdict."   State v. Patrick, 107 Mo. 168; Matthews v. State, 19 Neb. 330; Gazley v. State, 17 Texas App. 267; People v.

Tierney, 67 Cal. 54; Dickey v. State, 21 Texas App. 430; Bailey v. Com., 82 Va. 107; Carney v. State, 118 Ind. 525; Hall v. People, 47 Mich. 636; State v. Cook, 65 Iowa 560; Lawson v. State, 17 Texas App. 292. (2) The verdict is so manifestly unjust and against the great preponderance of the evidence that it can not be otherwise than ascribed to passion and prejudice, and not to that calm weighing of the facts in evidence, which should always characterize the deliberations of a jury. On such occasions this court should not hesitate to set the verdict aside. State v. Jaeger, 66 Mo. 179; State v. Primm, 98 Mo. 372; State v. McNamara, 100 Mo. 117; State v. Packwood, 26 Mo. 340; State v. Burgdorf, 53 Mo. 65; State v. Mansfield, 41 Mo. 470; State v. Daubert, 42 Mo. 238; State v. Brosius, 39 Mo. 634. (3) The statute requires the court to instruct the jury in writing upon all questions of law arising in the case. It is a question of law as to whether the testimony of a prosecutrix in a rape case should be corroborated. It is a very essential element for the information of the jury in making up their verdict. A failure to so instruct is good cause for setting aside the verdict of the jury and granting a new trial. R. S. 1889, sec. 4208; State v. Patrick, 107 Mo. 173. There was no instruction given the jury as to whether or not prosecutrix's testimony should be corroborated. For this error the judgment should be reversed. (4) The court committed reversible error in this case in allowing the prosecutrix to testify that a third party came to her and told her to testify to a certain fact; also offered her money to go away and not testify at all. State v. Jaeger, 66 Mo. 180; State v. Patrick, 107 Mo. 154.

*Edward C. Crow*, Attorney-General, *Sam B. Jeffries*, Assistant Attorney-General, and *Geo. W. Emerson*, Prosecuting Attorney, for the State.

(1)   Defendant cites Revised Statutes 1889, section 3480,
State v. Burgdorf, 53 Mo. 65, and State v. Perkins, 11 Mo.
App. 82, to sustain his contention that there was no evidence
to support the verdict.   The evidence in the above cases are so
totally different from the evidence in the case at bar that they
are not in the least applicable here.   (2)   Defendant insists
that the court erred in not instructing the jury that prosecutrix
should have been corroborated.   In State v. Dusenberry, 112
Mo. 292, this court said that the circuit court properly refused
.an instruction to the effect that prosecutrix in rape cases must
be corroborated.   State v. Wilcox, 111 Mo. 569.   (3)   The
State suggests that the judgment in this case can not be set
aside or arrested for the purpose of reversing the case or dis-
charging the defendant for the reason that no motion in arrest
of the judgment was filed by defendant in the circuit court
which fact is substantiated by the record as found in the bill of
exceptions.   R. S. 1899, sec. 2692.

SHERWOOD, P. J.—Ten years in the penitentiary was
the term of punishment which the jury awarded to defendant
on a charge of having ravished his stepdaughter Hattie Kent,
a girl of fifteen years of age, on the sixth day of October, 1898,
and judgment went according to the verdict.

One of the grounds of the motion for a new trial is that
there is no evidence to support the verdict.   The evidence has,
in consequence, been most thoroughly examined.

Numerous errors are also assigned as reasons for reversing
the judgment rendered.   The statements made by counsel on
either side are far from satisfactory, especially so, because of
the assertion that "there is no evidence," etc.

Adopting such portions of defendant's abstract as will
answer my purpose, I will make such additions thereto, and
emendations thereof, as may be requisite.

Hattie Hopkins, the prosecutrix, testified: "My father's name was Richard Kent; he died April 9, 1894, and my mother married the defendant about three years ago. My mother had four children by her first marriage, and the defend-ant had three by his first marriage; their names are Frankie, who is nine years old, Johnnie and Lena Huff. On the night this offense was alleged to have been committed, I was at my home in Prairieville, with my little brother, Fadie, twelve years old and the defendant's three children. We were all down stairs in the front room. My mother and older sister were at the drugstore in Eolia, about one mile south from Prairie-ville. We were all asleep in the front room down stairs, that is, myself, Frankie Huff, Johnnie Huff, Lena Huff and Fadie Kent. Between nine and ten o'clock defendant came and broke a window. That waked me and I halloed to Frankie to get up and see who it was. She let him in. He made Frankie and me dress and get on the horse with him, saying he was going down to the store and kill my sister and mother. We went down part of the way to Eolia, then turned and came back. He put the little girl down and told her to run into the house. I jumped off the horse and started to run, but he held me and said if I did not stay there he would kill me. The horse was left in the yard that night. He took me around to the barn. Then we went to the house and he drew his pistol on us, told us if we did not go up stairs, he would kill us, and went on up stairs. I went up stairs, he stayed down stairs. Frankie and I were both in the front room up stairs. In about one-half hour he came up stairs in his underclothes. His little girl and myself were screaming and he took me into the back room and threw me down; he got all my undergarments off but one foot, and forced my legs apart. Frankie came in and begged her papa not to do me that way, and holloed for Dick Henry, the

nearest neighbor, and he drawed his pistol on her and made her go back into the front room."

Prosecutrix then stated in response to the prosecuting attorney's questions: "Well, he threw me down and *fucked me.*" The two last words the prosecutrix repeated at the instance of the prosecutor. "The next morning I told my mother and sister Oney who returned that morning, and we went over to Mr. Smith's and had him arrested. With reference to the time we were at the barn, "*he tore my underclothes off of me,* before he threw me down, then he threw me down and did the same to me he did upstairs." This answer was made to a direct question by the State's attorney, as to what defendant did at the barn, and this was permitted notwithstanding the witness had exhibited no unwillingness to testify, and at the barn she said she was screaming, and defendant threatened her with the knucks and pistol. Such direct and leading questions as that just mentioned are a striking feature of this case, all through the examination in chief of prosecutrix. Thus: "Did he say anything else he was going to do, that you remember of?" "Then what was done?" "Where did you go then?" "What did he do when he came up there?" "What did he do then?" "State what he did then?" Such questions were vainly objected to by defendant as leading and suggestive, the court remarking in overruling the objections, "What the defendant did or said at the time would be competent," which was not the ground of the objections made, but that the witness was being led step by step, and not allowed to tell her own story in her own way.

The prosecutrix then stated that she remained at Mr. Smith's that day, then went to Bowling Green, then to the sheriff Hopke's, where she remained about twenty days, when her mother went up after her and sent her home; that after reaching home she went to William Huff's, father of defendant,

and from there she went with her mother and him, to Troy, to R. H. Norton's office; that she was married to Hopkins first day of November, 1898; last saw Hopkins at Hopke's, the sheriff's; don't know where Hopkins is now.  Was married at Jim Huff's, defendant's uncle.

Was examined by three doctors three or four days after alleged offense.

On cross-examination witness testified:  Oney never had lived with the family since defendant married her mother; she was living out, never lived as a member of the family, "since her and him has been married."

But she testifies that Oney did come with the family from their old residence when they moved from there to within a mile and a half of Eolia, defendant's present place of residence, and had just gotten back home when the supposed offense was perpetrated.  That "my stepfather and her (Oney) never got along good together."  That stepfather was never kind and good to witness; mistreated her, and she didn't like him.  Dick Henry's house, a frame, adjoined where defendant and his family lived.  Rock road in front of house sixty feet wide.  When defendant got home that night, first thing he did was to ask where his wife was.  Then witness corrects this by saying:

"Q.  When he came home, you say you were down stairs and Mr. Huff came into the room where you say you were? A.  Yes, sir.

"Q.  And asked you where your mother was?  A.  Yes, sir.

"Q.  And you told him up at the store?  A.  He didn't ask me where she was:  I was mistaken there; he didn't ask where she was.  He came by the store, he said, and went into the store to kill them and they went over to the hotel that night and stayed until he came home.

"Q.  You say now that he came in and told you that he

had gone by the store to kill them? A. He had come by the store.

"Q. To kill them? A. Yes, sir.

"Q. Did he tell you he saw them there? A. Yes, sir.

"Q. I thought you said a minute ago that they had gone over to the hotel and gone to bed? A. They hadn't gone over to the hotel and went to bed; when he went to kill them, they went over to the hotel.

"Q. Then he came on back up there to the house where you were within a mile and a half and told you that he had been in the store to kill your mother and your sister? A. Yes, sir; he did." .... He came in and he said to me, 'Hattie, you and Frankie get up and put your clothes on, I am going down and you got to go with me down to Eolia; I am going to kill Oney and your Ma.'

"Q. He said that? A. Yes, sir; he did.

"Q. He had already told you that he had come by the store to kill them? A. He told us that after we started.

"Q. Do you mean to tell this jury that Bud Huff came up there and told you and his little girl to get up and go down to the store with him for the purpose of killing his wife and his stepdaughter; is that what you say? A. Yes, sir.

"Q. He had just told you that he came by the store to kill them? A. He told us that after we started.

"Q. He told you to get up and let's go and kill them, and after you started he said he had already been there to kill them; is that right? A. Yes, sir.

"Q. He made you get up and dress and he made his little girl, Frankie, get up and dress; is that right? A. Yes, sir.

"Q. Fadie was there in the house, wasn't he? A. Yes, sir.

"Q. He didn't make him get up and dress? A. No, sir.

"Q.   Then there were those other two little children of Mr. Huff's that are sitting back there; they were there, were they not?   A.   Yes, sir, they were there.

"Q.   He didn't make them get up and dress?   A.   Yes, sir.

"Q.   They were all asleep?  · Yes, sir; except Fadie; he was not asleep.

."Q.   He left Fadie there?   A.   Yes, sir." . . . .

"Q.   How old is Fadie?   A.   He is twelve years old.

"Q.   How old is Oney?   A.   She is twenty. . . . . .

"Q.   You say that he tore your undergarments, out at the barn?   A.   Yes, sir.

"Q.   How did he tear them?   A.   He tore them down at the side and across the front.

"Q.   May I ask were they open in front or at the side? A.   At the side.

"Q.   He tore them in front and tore them at the side? A.   Yes, sir.

"Q.   Did he tear them with his hands?   A.   Yes, sir.

"Q.   Did he take them off there all except one foot?   A. At the barn? · No, sir.

"Q.   Did he take them off there?   A.   No, sir.

"Q.   Then you wore those garments on back upstairs? A.   Yes, sir."

The witness, it will be remembered, had previously stated in reference to what was done at the barn, that: "He tore my underclothes off of me before he threw me down."   Continuing to testify on cross-examination witness stated:   After she was married in Lincoln county at Jim Huff's, she and Will Hopkins (her husband) went in a wagon from Jim Huff's in Lincoln county down to the Missouri river; crossed it into Gasconade county, and went through that county into Crawford and Dent counties; that Will Hopkins and herself were the ones

that first started in the wagon, and were all that ever were in the wagon until they got *"close to Cuba."* (Other testimony showed that Cuba in Crawford county is 200 miles from Lincoln county.)

Proceeding, the witness after making answer as last above indicated, in response to this question: "Then who came?" answered: "Bud Huff and his uncle, Bert Huff, from Eolia." Pressed with questions, witness was forced to admit that defendant (called Bud Huff) and Bart Huff, joined them before crossing the Missouri river, and witness, her husband and defendant from that time on, all three slept in the wagon as they journeyed on. That when close to Cuba, they stopped in a little grove near Ben Willard's house, and slept in the wagon part of the time, and part of the time in Willard's house. Then all three of them went on down to Salem in Dent county, being two days on the road. When they reached Salem, defendant rented a house there and all three of them lived together in the same house till defendant was arrested.

Witness was asked the following questions and made thereto the following answers:

"Q. Now, I will ask you if you did not go to Bud Huff at Salem in Dent county and tell him that if he didn't give you and your husband enough money to buy a barber shop with, you were going to write back here to these officers? A. No, sir; I didn't tell him that. I wrote back here to Mr. Hopke the next day after we got there.

"Q. You wrote back the next day, and in two or three days after that Mr. Hopke was down there? A. Yes, sir.

"Q. You wrote the letter yourself? A. Yes, sir; I did.

"Q. You didn't ask Mr. Huff for any money before you wrote? A. No, sir.

"Q. You deny that? A. No, sir; I did not.

"Q. Mr. Hopke came down there and got Mr. Huff and

you folks started back in the wagon? A. Yes, sir.

"Q. You didn't see Bud Huff any more then along on the road, did you? A. No, sir.

"Q. You came straight on back to where? A. Came back to Tom Huff's then.

"Q. And you stayed there for a while? A. Yes, sir.

"Q. Where did you go from there? A. To Foley.

"Q. Then you came up here and have been in the county jail ever since, haven't you? A. Yes, sir.

"Q. I will ask you if you did not tell Ben Willard at or near Cuba, in Crawford county, some time during the month of November, 1898, that Bud Huff never had mistreated you? A. No, sir; I did not tell him that.

"Q. I will ask you if you did not tell Ben Willard at the time and place referred to in my former question, that Bud Huff had been better to you than your own father? A. No, sir.

"Q. I will ask you if you did not tell Ben Willard that your sister Oney caused you to put up this story on Bud Huff and that you did not know that it was going to lead to what it did and that you would get out of it now if you were not afraid you had gone so far you could not? A. No, sir; I never told Ben Willard nothing about this trouble."

Witness then stated that they came back to Jim Huff's in Lincoln county (the place where she was married), and then was asked, whether she did not tell Lavina Huff (defendant's grandmother) that there was no truth in the charges against Bud Huff? When she replied she did not. Then witness was asked these questions and made these answers:

"Q. I will ask you if you did not tell her (Lavina Huff) that Oney caused you to make up this story and that you didn't know how you could get out of it without sticking to it? A.

No, sir; nobody never told me to put up this story; it is the truth.

"Q.   You know John Huff, don't you?   A.   I have seen him; I don't know whether I would know him if I saw him again.

"Q.   You have talked to him, haven't you?   A.   No, sir; I never talked to him. .

"Q.   I will ask you if you did not tell him at Jim Huff's in Lincoln county in January, 1899, that if he would go and get Bud Huff to give you one hundred dollars, that you would not appear against him?   A.   No, sir; I never seen John Huff there.   I never seen him there.

"Q.   I will ask you if John Huff did not tell you there that if there was any truth in these charges against Bud Huff, it was your duty to prosecute him and not desist from prosecuting him?   A.   No, sir; he did not.

"Q.   I will ask you if you did not tell him that there was no truth in it and that Oney was to blame for this whole business?   A.   No, sir; I never seen John Huff there."

Witness said she saw Jim C. Huff, and she and her husband lived in the same house with them at Foley, and was then asked these questions, and made to them the answers following:

"Q.   I will ask you if, after he told you it was your duty to prosecute him, Bud Huff, if he was guilty, if you did not tell him that Bud Huff had never done anything more to you than your own father and that Oney caused you to put up this scheme?   A.   No, sir; I never told nobody that.

"Q.   Did you tell him in substance that?   A.   No, sir."

"Q.   You know Miss Josie Sitton, don't you?   A.   I have seen her.

"Q.   You went over there some time in the month of January, 1899, didn't you?   A.   Yes, sir.

"Q.   I will ask you if, sitting in a room in that house at

the time you went over there, you did not tell her that Bud Huff had been good and kind to you; that he never had mistreated you and that Oney caused you to put up this job? A. No, sir; I told you I never told nobody about it.

"Q.   I will ask you if in that same conversation you did not say to Miss Josie Sitton that you and Oney had made it up to shoot Bud Huff first? A.   No, sir; I never thought of such a thing.

"Q.   And that when the time came, some little child came into the room and you could not dispose of him in that way and you then adopted this plan. Did you tell her that? A. ˙ No, sir.

"Q.   Didn't you further tell her that there was no truth in the charges, and that Oney had put you up to it? A. No, sir; I did not.

"Q.   And in the same conversation that you had with Effie Sitton, the young lady that stood up with you when you were married, I will ask you if, at the same time and at the same place alleged in my former question, you did not tell Effie Sitton that there was no truth in the charges against Bud Huff?  . A.   No, sir; I did not.

"Q.   That Oney Kent, your sister, had put up this job, first to kill your stepfather; that failing, then you adopted this plan at her suggestion? A.   No, sir; I did not.

"Q.   Didn't you tell Mrs. James C. Huff at the same place in Lincoln county that there was no truth in these charges, and that Oney had caused you to put it up? A.   No, sir.

"Q.   Didn't you tell them in that conversation that you and Oney had been devising some scheme by which you could effect a separation between your stepfather and your mother? A.   No, sir; I did not.

"Q.   And that you believed and Oney believed that you so stated, that if they would charge your father with this offense

there would not be anything of it, but it would produce a separation between your mother and your stepfather? A. No, sir.

"Q. Do you know Tom Huff? A. Yes, sir.

"Q. Didn't you tell him that there was no truth in these charges, in the month of January, 1899, in the county of Lincoln? A. No, sir; I did not. I never had no talk with him.

"Q. I will ask you if, in Eolia, prior to your marriage and in the month of October, 1898, in a conversation with Bart Huff, you did not tell him that there was no truth in these charges; that Bud Huff had always been kind and good to you, but that he and Oney didn't get along and you were trying to separate your mother and your stepfather? A. No, sir; I did not.

"Q. Did you tell him the same thing when he came to you at the wagon, wherever that was, when Bud Huff got in the wagon and went away with you and William Hopkins? A. No, sir; I did not.

"Q. While you were riding along on horseback, didn't you have the conversation with Bart Huff which I have just detailed in which you told him that there was no truth in the charges that you had preferred against William Huff, but that your sister Oney had caused you to do it in order that you might produce a separation between your father and your mother and that Mr. Huff had always been kind and good to you? A. No, sir.

"Q. Didn't you have a conversation with Tom Huff to the same effect? A. No, sir."

On re-direct examination, witness, asked where she first saw Bud Huff, when she was in the wagon, replied: *"I first saw him this side of Cuba,"* and that Bart Huff, his uncle, was with him. She gave as a reason for going on with Bud Huff to Salem, that she had "no way to get back; didn't have no

money to go back on, and couldn't go back." But, as shown by a former portion of her testimony, when defendant was arrested, she and her husband started and went home in the wagon in which they had reached Salem; and it seems had no difficulty in doing so. Then in her re-direct examination this passage occurred, which, like the proverbial fly in amber, will be here preserved, as a legal curio:

"Q. I will ask you whether or not any one *representing* the defendant at that place, asked you to testify when the trial was called, that Oney had put up the job and there was nothing in it?

"Objected to by defendant. Objection by the court over-ruled. To which ruling of the court, defendant then and there, at the time, excepted.

"Q. Did anyone that was representing the defendant try to get you to testify that way? A. Yes, sir.

"*The Court.* Unless it should appear that such person did *represent the defendant,* the evidence would be stricken out.

"Plaintiff's counsel:

"Q. I will ask you if in that same conversation, the party did not try to get you to go off to Illinois or some other place and not appear? A. Yes, sir; they asked me didn't I think it would be best."

On her re-cross examination, witness was again given opportunity to tell where she met defendant by being asked, if she did not meet defendant and Bart Huff just a little beyond Silex. This question she tried to evade by saying she "didn't know where she met them; didn't know where the county line was." Asked if she knew where Silex is, she gave no direct answer, but said, "I know it was further than that." Asked again if it was very far from Silex where she met defendant, she replied, "I think it was a right smart ways from Silex." Pressed with other questions, she was finally asked if it was

more than two days' drive beyond Silex where she met them, when she answered, "Yes, sir." On the re-re-direct examination of witness, she was asked and answered when she had seen her husband last, and then in singular contrast with the curio above noted occurs this passage:

"Q. I will ask you if he brought any word from this defendant or any proposition from him in reference to your testifying or not testifying in this case?

"Objected to by defendant. Objection sustained."

The prosecutrix was flatly contradicted in many material points and particulars, thus: S. B. Nykirk testified that Hopkins and Hattie were married at the old Huff homestead on November 1, 1898; that on the next day, (November 2) they left the old homestead in a wagon, and *he went with them to meet Bud Huff*, and they met him a little west of south of Silex, about one and a quarter or one and a half miles. And it was perfectly competent, though ruled to the contrary, by the trial court, if prosecutrix said at the time where she was going, to offer such utterance in evidence; because the declarations of intent of a party on a journey, or leaving home, being made at the time of the transaction, and expressive of its character, motive or object, are regarded as *"verbal acts,"* original evidence, a part of the *res gestae,* and therefore, admitted in evidence like any other material facts. [1 Glf. Evid. (16 Ed.), sec. 108.] This witness stated Silex was in Lincoln county. Another witness stated the Huff homestead was about seven miles from Silex, and that Lincoln county was some two hundred miles from Cuba.

Bart Huff, a blacksmith and uncle of defendant, testifies to having met Hopkins and Hattie about a mile or a mile and a half from Silex; that Bud Huff and Nykirk were with them at the time; and that witness went to the other side of the Missouri river with Hopkins, Hattie and defendant, and that on the way,

Hattie told him that Oney had more to do with the prosecution of defendant than she had, and that defendant was kind and good to her.   That witness went over to the point already mentioned, to meet Hopkins and take him across the river, and that it was not a fact that Bud Huff got with Hopkins and Hattie just this side of Cuba; that witness went across the Missouri river with Hopkins, Hattie and Bud Huff, and went three or four miles with them on the other side after crossing.

Mrs. Lavina Huff, nearly eighty years old, grandmother of defendant testifies that Hattie and Hopkins came to her house in Lincoln county, after their return from Dent county, and had stayed at her house several days, and witness asked Hattie what there was in these charges about Bud Huff, and she answered, *"Nothing no more than her own born father."*

Miss Jessie Sitton testifies that at her mother's house in Foley, Lincoln county, Missouri, in January, 1899, her sister, Effie Sitton, was present and also Hattie Hopkins, when a conversation sprang up between witness and Hattie.   Hattie Hopkins told witness "that she and her sister Oney had first fixed it up to shoot her stepfather," and in that conversation, she told witness that "the plan failed because defendant's little daughter, Frankie, came into the room," and she also stated to witness in that conversation, that Oney afterwards suggested the present plan; that in conversation Hattie told witness "that there was no truth in the charge that Bud Huff had assaulted her;" that in the same conversation Hattie told witness "that she had no idea that it was as serious as it was, and that she only wanted to separate her mother and her father;" that "she would back out of it now if she could;" that "her stepfather had never laid his hands on her in violence," that "he was just as kind to her as he could be, and she never wanted for nothing."   On cross-examination it developed that witness was a sister-in-law of Tom Huff, uncle of defendant.

Miss Effie Sitton fully confirms the statements made by her sister as already related. The latter witness was bridesmaid for Hattie at her wedding, and had never seen Bud Huff until the day before she testified.

Tom Huff testifies, that he lived at the old homestead place in Lincoln county; that he is uncle of defendant; that after Hopkins and Hattie returned from southeast Missouri, he had a conversation with Hattie in regard to the charges against Bud Huff, and in that conversation Hattie told him that there was no truth in the charges against defendant; that her oldest sister, Oney, had planned the present prosecution for the purpose of separating her mother from defendant; that she didn't have any idea that the charge was as serious as it was, when she made it, or she would not have done it; that all she wanted to do was to make defendant run off and leave.

John Huff, a cousin of defendant, testifies, that at the old home place in Lincoln county, between the twentieth and last of January, 1899, he had a conversation with Hattie, and she said that there was no truth in the charges made against Bud Huff; that her older sister Oney had suggested the scheme and put her up to it. The court here refused to let witness answer whether Hattie had told witness that if he would go and get Bud Huff to give her $100, she would not appear against him; that witness told Hattie that if Bud Huff were guilty of this offense, it was her duty to prosecute him.

Ben Willard testifies, that he lives three-fourths of a mile south of Cuba in Crawford county: I know Bud Huff, Hattie Hopkins and Will Hopkins. I met them the first time about the latter part of November or first of December; they were traveling in a wagon, and camped on my place about one month. During their stay there, I had a talk with Hattie Hopkins, in which she stated to me, there was no truth in the charges made against Bud Huff; and that he was not guilty of any offense

committed against her.    And in another conversation with her and her husband together, they said they were going to have some money out of Bud Huff or put him behind the bars.

Mrs. James C. Huff, testifies, that she had a conversation with Hattie the last day of October, 1898, which was the day before the wedding, when Hattie came to her and asked for advice, and in that conversation Hattie told her that there was no truth in the charge that had been preferred against Bud Huff; that Oney had put her up to it; that she had already made it, and she didn't know how to get out of it; that she didn't think it would cause any trouble, and she would get rid of her stepfather.

Frankie Huff, the nine-year-old daughter of defendant who rode in front of her father and in his arms on the night in question, while Hattie rode behind on the same horse, testifies in direct contradiction of every material thing testified to by Hattie, and gives as a reason for telling a different story, that Hattie told her next morning, unless she did so, "she would whip her." This witness denies statement of the negro woman about saying, "Oh, papa, don't do that," and, "Papa, don't "

Col. R. H. Norton testified:    I live at Troy and am an attorney, practicing law there.    I know Hattie Hopkins, who was said to be prosecuting witness against Huff.    I had a conversation with her in my office in Troy about the month of October, 1898.    She told me in effect, that Bud Huff had not ravished her.    I don't know that she said it in those particular words.    I asked the girl if he had succeeded in accomplishing his purpose and she said, "No, he had not."

Defendant, testifying in his own behalf, stated:    Am thirty-two years old.    Was first married in 1889, and have three children by that marriage; that he married the widow Kent in 1894; she had four children; that the two sets of children lived with him and his wife on a farm in the Mississippi

bottom until the spring of 1898, when he moved with them to Eolia, where he farmed and ran a drugstore until this alleged offense. That the family relations were of the pleasantest; that the only one that ever caused any trouble was Oney Kent; that his children thought as much of his wife as they ever did of their mother. The day before the night of the alleged offense, I went down in Lincoln county; as I returned home that night through Eolia, I stopped at the drugstore and got a bottle of whiskey; there was nobody at the store; when I got home everybody was asleep. The front door was locked and, as is my custom, I went around to the window and knocked on the window. My little daughter came to the door and let me in. I asked where her mother was; they said she and Oney were at the store. I told them I was going down there and they could go along, too, if they wanted to. They got ready and we got on my horse, which was hitched at the fence, Frankie on my lap in front of me and Hattie on behind. We had not gone far until I got sick and then turned around and went back to the house. I helped Frankie down and Hattie slid down; they both went into the house, and I took the saddle and bridle off my horse and tied him in the yard with a rope. I was sick and threw up before I got into the house. When I got into the house, I pulled my shoes off and went to bed with my clothes on. Frankie and my little daughter awoke me for breakfast, and I told them I was sick and did not want any. In the meantime my little daughter, Frankie, came in and told me Mr. Hardin and Mr. Yeager were there to arrest me. After a short time Mr. Yeager came to the window, and I asked him to come in. He said he wanted to see me. We talked quite a bit, and I told him what my little daughter said, and asked him if he had a warrant. He said "Yes;" he did not tell me what it was for, nor wouldn't tell me. I asked him to come in, but he would not come in, and then Hardin came

up, and I said I did not want him to come in.    He then left
and went out into the road.    I then went to the front door and
opened it and saw some thirty men out there.    I picked up a
thirty-two rifle in my hand and walked out there in my sock
feet.    Somebody hollowed for me to throw up my hands, and
a Mr. Brown jumped off a wagon and got a pistol and shot at
me.    Nobody had read a warrant to me nor told me what they
wanted.    I had never made any demonstration with my rifle,
was just holding it on my arm.    I had a talk with Squire
Smith and told him I would go with him, and asked him what
the charge was and he said he would tell me after he got to
Eolia.    The crowd was excited, and running up and down, and
riding on horses, and running after guns and pistols.    Len Bibb
walked over and told me, "You get away from here, and do it
quick."    I put on my shoes and my wife laced them up while I
stood facing the crowd.    She then saddled my horse and my
brother-in-law rode up and told me to get on that horse and go
with him.    I rode a mile and a half before I ever knew what
was up.    I met Hattie Hopkins and her husband on the second
day of November, about one mile and a half from Silex, and
went with them down into southwest Missouri.

Recurring to the night of October 6th, witness testified that
he never did have sexual intercourse with Hattie Hopkins; that
he never did have a pair of brass knucks.    Witness further
stated that on the morning of the eighth of October, 1898, he
met his father (Wm. H. Huff), and had on the same clothes
that he left home with; slept in my clothes, pants and all.    Had
on the same overshirt, and same undershirt that he had on on
the night of October sixth when the offense is said to have
occurred; didn't have a change of undershirt till he sent by his
aunt and bought a new shirt in order to change.    He showed his
clothes to his father and he examined them.    That he met
Hopkins and Hattie, who were in a wagon, about a mile and a

quarter to a mile and a half from Silex; about half past 8 o'clock, when we met.   They said they had come from Grandma Huff's old place; that witness got in wagon and drove, and Hattie and Hopkins got in and laid down on the bed and covered up in the back end of the wagon.   That he drove the other side of Troy and stopped, and after putting the wagon sheet on, drove that night two miles the other side of Wright, stopped, camped a couple of hours and fed.   Next day crossed river at Washington, and next Uncle Bart left them, after they crossed the river.   Until Uncle Bart left, he and witness slept under the wagon, and Hattie and Will in the wagon, in which were two feather beds, but after Bart left, Hopkins and Hattie slept in back part of wagon, and witness in front part.   Landed at Willards twenty-first of November.   Wife of witness came to him at Cuba, seventeenth or eighteenth of November, 1898, when defendant and Hopkins and Hattie were at Willard's. Landed in Salem twenty-second December, having left Willard's two days before that.   Defendant rented a house that evening, and they all, Hopkins, Hattie, and defendant and wife moved into it the next morning, and remained there until defedant was arrested on the eighth day of January, 1899.

Wm. H. Huff, father of defendant, testified:   I saw my son the second morning after the night of the alleged offense and examined his clothes, and found no stain or anything.   I examined his drawers, undershirt and overshirt.

Prosecutrix being re-called denied ever having any conversation with Col. R. H. Norton of Troy, Missouri; then confessed to having a conversation with him and denied that she told him that "he did not ravish her."   But testified that she did tell Col. Norton that defendant *did* ravish her.

Mrs. Patterson testified:   That she lived just one block south of defendant's house.   That she heard a peculiar noise

State v. Huff.

like children screaming, on the night the offense is charged to have been committed. It was between nine and ten o'clock.

America Dewey, a negress, testified: She lived just north of the Huff house, in the next block; that about ten o'clock of the night in question, she heard a child screaming; she went out to the fence, and heard the little child say, "Oh papa, don't do that! papa don't." And then she heard another scream, and then she heard low talking she could not understand, in the Huff house and didn't hear anything else, but she gave no alarm and made no further inquiry.

When Ben Willard was concluding his testimony, and on cross-examination, this question was asked him by the State, and this answer given:

"Q. Didn't you, just about the time they started off and you came up and bade Bud good-bye, didn't you say, "Good-bye, if you need me, let me know and by God, I will come up and help you out," there in January of 1899, at Cuba, Missouri, in the presence of Mr. Hopke? A. No, sir."

The evident purpose of this question was to break down Willard's testimony, or else to neutralize its damaging and damning effect; and so Hopke was again brought forward, and then was asked this question:

"Q. I will ask you if, about the time you were leaving Cuba, Mr. Willard did not come up to Huff close and say, 'Good-bye, if you need me, let me know and by God, I will help you out?' A. Yes, sir; something to that extent. It was when we were going in to dinner. Dinner was ready. We were in the hotel." . . . .

"Q. Did he say that? A. I don't know about the 'Good-bye,' but it was to that extent.

"Q. Leaving out 'Good-bye,' did he say the other part?" . . . . A. As well as I remember, words to that extent."

On objection being again raised by defendant, and on wit-

ness being reminded by the court that the answer must be yes or no, he said: *"I will say yes."* And this question was made, notwithstanding Hopke subsequently admitted that Willard and. Huff talked in such a low tone that he "couldn't hear only once in a while."

But it is wholly immaterial whether Willard made use to Huff of the words mentioned or not. If he did, and he heard Hopkins and Hattie make the remarks he had testified to, then the language he used to Huff, was only such (barring, perhaps, expletives) as any honest, generous-hearted man might utter to one whom he believed to be *foully assailed.* Because one man tells another who is in distress, "I will help you out," is no indication of *dishonest* help, and will arouse no suspicion of intentional wrong, in a heart that beats with honest impulses. The questions and answers mentioned were therefore obnoxious to the objections made to them by defendant's counsel, and those objections should have prevailed. I have thus given the substance of the evidence, except some minor portions which will be mentioned and discussed hereafter. .

Reading over the evidence as above set down, it will readily be noticed in what a variety of ways the prosecutrix was contradicted. She evidently and intuitively knew when she went on the stand, or else had been carefully informed prior thereto, that it would present a bad appearance, should it become known that on the next day after her marriage, at the old Huff homestead, where the nuptial ceremony was performed and the epithalamium sung, she and her husband went with Nykirk *"to meet 'Bud,'"* her erstwhile ravisher, and did meet him only eight and one-half miles from the point of starting, and thence journeyed on, sleeping with him in the same wagon and under the same wagon sheet, for weeks and weeks together; and so she endeavored to conceal the point where the meeting occurred, by saying of that point, that it was "this side of

Cuba;" that "it was close to Cuba;" that "I don't know where we met them. I don't know where the county line was," and finally winding up by saying that it was more than two days' drive. These statements were directly opposed by the testimony of Nykirk, Bart Huff and defendant. And that the State's attorney appreciated the position of prosecutrix and its liability to excite unfavorable comment because of meeting defendant and journeying with him in the wagon to the point ultimately reached, is palpably shown by the following questions propounded by that official to prosecutrix, and her answer to it:

"Q. I will ask you why, after Bud Huff came there, that you went along in the same company with him to Salem? A. Well, because I didn't have no way to get back; didn't have no money to go back on and couldn't go back."

Inasmuch as it had been shown by several witnesses that it was only seven miles from the old Huff homestead to Silex and that Bud Huff had joined Hopkins and Hattie only one and one-half miles from Silex, the false and deceptive character of the answer given, is only too apparent. No money was required to travel eight and one-half miles. Besides, by a former portion of Hattie's testimony, it was shown that upon defendant's being arrested, Hattie and Hopkins found no difficulty in making their way back home in the same wagon they went out in. And more than all that, Nykirk, who accompanied Hopkins and Hattie from the old Huff homestead, until they met defendant and whose testimony on the point is undisputed says: *"I went with them to meet Bud."* So that Hattie, on the morning she started, knew she was going to meet Bud Huff. And the further thought suggests itself, that if Hattie could write and mail a letter to Hopke on the next day after reaching Salem she could easily have parted company with defendant at an earlier period by mailing a similar letter at Knob View, Cuba, or other

point, to Hopke of defendant's whereabouts, or at any point on the road, she had but to direct attention to defendant as an escaped felon, and his arrest would have been accomplished. The only reason which can be given why she did not sooner cause the arrest of her ravisher, "while she was in the way with him," is a reason strongly confirmatory of Willard's testimony. Finding she could not extort money from him, she resolved on reaching Salem, to use the alternative, and accordingly wrote Hopke. And such arrest, certainly went to further the scheme which she and Oney had long entertained, and which at one time led them to plan the murder of their stepfather, by shooting him, and which murder was only prevented, as she confessed to the Misses Sitton, by little Frankie coming into the room.

Not only was the prosecutrix's testimony opposed as just related, and in the different and various ways heretofore set forth, but portions of her own testimony are self-contradictory. Thus, she stated that defendant "tore my underclothes off me at the barn before he threw me down;" and yet on cross-examination she stated that he didn't take them off at the barn; that at the barn he tore them down the side and in front—across the front, but didn't take them off there; but that she wore them back upstairs; and still in her examination in chief, when testifying as to what transpired at the house, when in half an hour defendant went up stairs, that "when he threw me down, he forced my legs apart, and got off all but one foot," etc. Now, if the undergarments were as thoroughly torn, as she says they were down at the barn, so as to constitute no obstruction to defendant's successful efforts down there, then there was no call whatever, to get her "undergarments off all but one foot," when he made his second endeavor at the house.

There are also, elsewhere in her story, impossibilities and improbabilities too gross for belief, to-wit, that with pistol in hand he forced her to get up on the horse, and then afterwards

he got up. Now, as any horseman knows, he could not in mounting the horse, throw his legs across the saddle while another person sat sideways on the horse behind the saddle, unless such person were to sit away back on the horse's crupper; but thus sitting back shows a *willingness* for the rider to mount, something which prosecutrix denies. And it is highly improbable, if not impossible, that defendant could have held his little daughter in his arms before him on the horse, guided the horse, and still with his *left* hand have reached back, and so gripped the *left* leg of prosecutrix, who sat sideways on the horse, as to hold her unwillingly on the horse, as she states he did.

Again, prosecutrix asserts that when defendant came home that night, and his little daughter went and let him in, he told them to get on their clothes, that he was going down to the store at Eolia, and they had got to go with him; that he was going there to kill prosecutrix's sister and mother; and that he had previously come by the store for that purpose, but they were not there. This statement is too improbable for rational human belief; it is contrary to the experience of common life; no motive or reason can be assigned for such a threat by defendant; besides, it is denied both by Frankie and her father. Moreover, evidence of such a threat on part of defendant, was wholly foreign to the case and charge then being tried; shed no light on the then pending accusation, and should have been *promptly excluded by the court of its own motion.* The evident purpose of the introduction of such threat in evidence was simply and only to prejudice the jury against defendant.

Another statement made by prosecutrix, that defendant was so lost to all sense of decency and shame as to ravish her in a thickly peopled village and next door to an adjoining house, while she was screaming; and in the presence and amid the pleadings of his little daughter, is something requiring far more than ordinary credulity to believe.

After a thoroughly careful examination in this case, I am abundantly satisfied that the prosecutrix has been plainly and clearly impeached; impeached both by disproving the facts stated by her, and also by proof that she has made statements out of court, contrary to what she has testified to at the trial [1 Grlf. Evid. (14 Ed.), secs. 461, 462], as well as by the intrinsic improbability of some of her statements, and the evident evasiveness and falsity of others. And no conviction based on conclusively impeached testimony should be permitted to stand when called in question in an appellate court. [People v. Lyons, 51 Mich. 215.]

Testimony completely impeached is no testimony at all, and rests on the same basis, in legal contemplation, as though no testimony had been introduced. And when such a case occurs, relief will be granted by this court. [State v. Packwood, 26 Mo. 340; State v. Primm, 98 Mo. 1. c. 373, and cas. cit.]

And the force and effect of the impeachment accomplished as aforesaid, is not at all abated or diminished by the testimony of the physicians who examined prosecutrix, since they could only speak of the congested condition of her genitals and of the absence of the hymen. Neither one of them would say that a rape had been committed on prosecutrix; indeed one of them said he *"would not say a rape had been perpetrated on her unless he had seen it."*

And relative to the testimony of Mrs. Patterson and the negress, Dewey, they testify to no crime having been committed, and their testimony, if true, as to the night they speak to, is entirely consistent with the idea that three children, the oldest only twelve, left in the house by themselves at night, might, in the absence of their father and older sisters, indulge in outcries, which ceased on the return of those who had left. For

the reasons aforesaid, the judgment should be reversed and defendant discharged.

There are other points, however, in this record which seem to demand attention. I refer now to the legal curio before noted and quoted. Such testimony so called, was most *flagrant hearsay;* the words *"representing the defendant,"* were but the statement of a *legal conclusion,* and, of course, non-traversible. *Who was it that represented the defendant?* Certainly, the latter was entitled to know who it was that assumed to speak for him. But even had *"the party,"* been named; and even had *he* stated to prosecutrix that he *did* represent the defendant, still, such statement, though repeated by prosecutrix when testifying, would be none-the-less and nevertheless, *flat hearsay;* since it would be the sworn statements of an unsworn statement. [Whart. Crim. Evid. (9 Ed.), sec. 223; 1 Whart. Evid. (3 Ed.), secs. 172, 173.]

Wharton says: "By the general rule of law, nothing that is said by any person can be used as evidence between contending parties, unless it is delivered upon oath in the presence of those parties. . . . . If material witnesses happen to die before the trial, the person whose cause they would have established may fail in the suit. But although all the bishops on the bench should be ready to swear to what they heard those witnesses declare, and add their own implicit belief of the truth of the declarations, the evidence would not be received. . . . . . . A, a witness not produced on trial, says he saw B do a particular thing. C, a witness produced on trial, says he heard A say that he saw B do this thing. A is really the witness, yet he is not responsible for what he says. He is not subjected to the probe of a cross-examination. He is not indictable for perjury. No recourse can be had to him to make him, ordinarily, liable, either civilly or criminally, for an error. But the rule that a party put on trial is entitled to have his case

tried on the evidence of responsible witnesses, is essential to the fair determination of the issue in litigation. In many of our constitutions we find one aspect of this rule given in the maxim, that a party accused has a right to meet the witnesses against him face to face. To dispense with these witnesses, and permit their testimony to be given by those who claim to have heard such witnesses speak, would be to evade this important sanction, and to put a party on trial on evidence whose falsity he would be precluded from either detecting or punishing.

"Hearsay, however, in its legal 'sense, is not confined to that which is said. Men may express themselves by conduct as well as by words; and to repeat what they said by words is no more hearsay than to repeat what they said by conduct."

Greenleaf says: "The law requires......the testimony of those who can speak from their own personal knowledge. ......It is requisite that, whatever facts the witness may speak to, he should be confined to those lying in his own knowledge, whether they be things said or done, and should not testify from information given by others, however worthy of credit they may be. For it is found indispensable, as a test of truth and to the proper administration of justice, that every living witness should, if possible, be subjected to the ordeal of a cross-examination, that it may appear what were his powers of perception, his opportunities for observation, his attentiveness in observing, the strength of his recollection, and his disposition to speak the truth." [1 Glf. Evid. (14 Ed.), sec. 98.]

Here the *icognitus,* provided, always, there were any such person, must have represented to prosecutrix, that he was representing defendant, which testimony, to dignify it by any such appellation, falls under the condemnation of the authorities above quoted. And it was not at all necessary, as has been suggested by the prosecuting attorney, for defendant to enter a "denial of the statement that the party was representing de-

fendant." Criminal causes are not ordinarily conducted in this way.

In State v. Rothschild, 68 Mo. 52, this case was presented: On the trial of a criminal case a witness for the prosecution testified that he had been induced to leave the State, and had received money for that purpose. The evidence failed to connect the defendant with the transaction. But the judge and the prosecuting attorney instituted an inquiry for the purpose of showing by the witness that the parties implicated were certain officers of the law. The defendant having interposed frequent objections to the prosecution of this inquiry, the judge remarked in the presence of the jury: "If the defendant is not connected with it, it can be withdrawn from the jury by instruction." But the evidence was not so withdrawn. *Held,* that the conduct of the court was error, requiring the reversal of the judgment.

In State v. Jaeger, 66 Mo. 173, Mrs. Wahl was allowed, against the objection of defendant, to testify in regard to his wife having called on her the morning following the alleged assault, and, in the absence of defendant, making proposals to have "the matter hushed up." And the non-admissibility of such so-called evidence was there sharply animadverted upon. [See also, State v. Patrick, 107 Mo. 147; Dillon v. The People, 8 Mich. 357.]

In concluding his ruling on the point, in the case at bar, the learned judge remarked: "Unless it should appear that such person did represent the defendant, the evidence would be stricken out." But the evidence was not stricken out, and so the jury properly, and not unnaturally, inferred that it was competent evidence, and that defendant was trying to suborn prosecutrix to swear falsely, or to induce her to leave the country, and not appear against him. [See Rothschild's case, supra.] And although the objections of defendant were general, yet the evidence being no account, such

general objections were good.    [State v. Meyers, 99 Mo. 107, and subsequent cases.]

In the midst of the trial, the prosecuting attorney offered in evidence, the following paper, to-wit, a subpoena in usual form, in the case of the State v. Wm. Huff, issued by the clerk of the Pike Circuit Court, to Ona Kent, Fadie Kent, and William Kent. This writ bears date June 5, 1899, and requires the parties named to appear before that court on June 26, 1899. Fadie Kent's name was indorsed on the indictment as a witness. On that subpoena was made the following return:

"Return.    I hereby certify that I served the within writ in the county of Calhoun the twenty-seventh day of June, 1899, by reading to Ona Kent, Fadie Kent, William Kent.

"G. E. Clowers, Spec. Deputy."

At the same time the prosecuting attorney offered also in evidence, an attachment issued in the same cause and by the same court, for Fadie Kent, dated August 14, 1899, for a contempt in failing to appear and testify, etc., and stating that he had been summoned on the part of the State.

This writ was directed to the sheriff of *Pike* county and had indorsed on it the following return:

"Return.    Served the within writ by making due and diligent search in Pike and Lincoln counties and not being able to find the within named witness. All done this sixteenth day of August, 1899.

"H. M. Hopke, Sheriff of Pike county,

"By R. T. Hopke, Deputy."

When these papers were introduced in evidence, the court, on admitting them, remarked:   "The writ is admissible simply on one point, as showing the effort upon the part of the State to produce the witnesses."

And the prosecuting attorney has remarked in his brief:

"Plaintiff offered in evidence subpoena and writ of attachment for Fadie Kent, twelve year old brother of prosecuting witness showing that Fadie was duly served with subpoena, but could not be found with attachment."

It seems a singular statement, indeed, to make, that *"Fadie was duly served with subpoena."* The opinion has generally prevailed that the process of any court was valueless and void when served outside of the State, in which process issued. [State v. Butler, 67 Mo. 59; Wilson v. Railroad, 108 Mo. 588, and cases cited; Murfree on Sheriffs, secs. 114a, 849.] And mere notice, not according to law, is no notice at all. [Wilson's case, supra, loc. cit. 598; sec. 849, Murfree, supra.]

You will observe that this return on the subpoena does not mention any *State* in which the service was had, but it does say it was served in *"Calhoun county."* As judicial notice will be taken of the fact that we have no such county in this State, we must presume that service was had either in Arkansas or in some other state; and this, under the authorities, renders such service of the subpoena a nullity. And you will also observe that the service is made by *"spec. deputy"* in his own name, which, had the service been otherwise good, would have made it bad. [Murfree on Sheriffs, secs. 843, 856.] The invalidity of such a return has been thus held in this State.

This being the case, no attachment was authorized to issue. But look at the return of service on the attachment; the writ of attachment dated August 14 only issued to the sheriff of *Pike* county, and yet we find the sheriff of that county, on the sixteenth day of August, the very day the trial began, not only making "due and diligent search" in his own county, but on the very same day, he extends his jurisdiction and makes due and diligent search in *Lincoln* county also. Pretty good day's work, that!

In case a subpoena is to be served, it is held that the

sheriff should go at least *once to the place of residence* of such witness, to seek him, and if he can not find the witness, appropriate return should be made setting forth that fact.    [Murfree on Sheriffs, sec. 359.]    And the same rule holds about going to the dwelling house, when the service of a summons is to be made.    [State ex rel. Kearney v. Finn, 87 Mo. 310.]    And *a fortiori* should there be at least an equal particularity used in stating the facts, in the return made on an attachment for contempt in failing to obey a subpoena.

But why was that subpoena sent away down to Calhoun county, Arkansas, or over to Illinois and service attempted there?    I must confess it has to me very much the appearance of attempting to imitate the "Great Circumlocution Office" mentioned by Dickens, that is, *how not to do it.*

If Fadie Kent et al. were taken clear down to Arkansas or over into Illinois just in order to be served, in order to make a show of great diligence to summon Fadie Kent, and then make a great exhibition of the worthless return in court, then that matter, taken in connection with the peculiar return made on the writ of attachment, certainly has a very suspicious appearance.    And although under our rulings, the State can not be compelled to place certain witnesses on the stand whom she had summoned, yet, having a witness, as in this case, necessarily conversant with the main facts at issue, and failing to serve him with process, or to put him on the stand, is certainly open to very grave observation and unfavorable inferences.    [Henderson v. Henderson, 55 Mo. 534; Cass Co. v. Green, 66 Mo. 498; Bump, Fraud. Convey., 53, and cases cited.]

And this is especially the case in circumstances such as here present themselves.    For, "when the part is overacted the delusion is broken and the fiction appears."    [Baldwin v. Whitcomb, 71 Mo. loc. cit. 659.]

Here there is neither showing nor pretense in the return

that the sheriff ever visited the residence of Fadie Kent's mother, nor does it appear that such residence in Prairieville has been changed; so that, the only diligence displayed by the sheriff in the matter, has been by writing the word *"diligent"* in his return.

But more than that, W. H. Smith, the "squire," who lived in Prairieville, Pike county, "right opposite to defendant; across the road right west from him," when asked if he had seen Fadie Kent about the place, answered, "I saw him last Sunday evening, on horseback with his mother." (This was August 13.) Strange to say, this testimony was objected to by defendant, and was by the court excluded. But the contention of the prosecuting attorney then made, that he had a right to show that this boy was "with defendant's wife on Sunday after he was subpoenaed," is without support, as the boy was supposed to be subpoenaed on the twenty-seventh of June, 1899. The court should not have excluded Smith's testimony, since it strongly tended to show lack of diligence in serving the witness either with subpoena or attachment. It is unnecessary to say what the proper ruling would be, and what the status of this case, had the subpoena been served by a proper officer within the limits of his territorial authority, and proper return of such service been indorsed upon the writ, and the same theory controls the attachment. In saying that Smith's testimony should not have been excluded although not objected to by defendant's counsel, is only to say that it is the right and duty of the trial court to see that the facts bearing on the case are fully developed, no matter whom it helps or whom it hurts. [State v. Pagels, 92 Mo. loc. cit. 310.] Of course it is not intended by this remark that counsel trying a cause are to be ousted of their appropriate functions, only that omissions and inadvertencies may, when necessary, be supplied and corrected by the court.

There is a great deal of *trash* in this record (a friend in Fort Smith, W. M. C., substitutes for this term a more apt bucolic expression). Thus, it was attempted to be shown over objections of defendant by the prosecuting attorney that Bud Huff owned the wagon and team that bore Hattie and Hopkins away from the old Huff homestead, and finally succeeded in showing that Bud Huff did own one of the four horses that were along with the outfit. This testimony was wholly irrelevant since Bud Huff was not accused of eloigning the witness, and the only tendency of such testimony, was to multiply the issues, confuse the jury and prejudice defendant by leading it to be supposed that he was engaged in taking away an important witness. Similar irrelevant matter was introduced by the State seeking to discover from defendant who owned the farm that was sold, he or his wife, how much it sold for; whether his wife owned the drugstore at Eolia; whether she had not mortgaged it to secure the fees of defendant's counsel, etc.

Over the objection of defendant the prosecuting attorney was permitted to ask these questions and to receive these answers:

"Q. I will ask you why you went to Cuba in Dent county? A. I was made to go.

"Q. Who made you go? A. Ma.

"Q. Who else, if anybody? A. Will Hopkins and Ma."

The court excluded the latter portion of the answer as to who made her go, leaving it stand in the words, "I was made to go." This answer is but the statement of a legal conclusion. For what purpose she was made to go, and how she was made to go, were certainly important if the first answer was. But at all events, what connection had defendant with the matter?

Equally incompetent was the question asked by the State over objection of defendant whether prosecutrix made any ob-

jection in June to being placed under bond for her appearance at court, and her answer that she "was glad it was done and wanted it done." Being asked why glad, she replied "because I was afraid to leave the jail." How giving bond could affect her fears of leaving the jail is not very apparent. But however that may be, what did it concern defendant? How did it touch the issue joined?

Defendant's counsel not to be outdone in irrelevancy, also endeavored to show that prosecutrix got drunk when at Willards; fired off a pistol, and was told she would be arrested, etc., etc., *ad nauseam*.

As to the instructions given by the court of its own motion, no objection can be made to them in this court, because in the lower court, the objection to such instructions, was as to "instructions numbered ———— of said instruction given," which of course amounts to nothing.

Nor can any complaint be heard here about the jury not being instructed on certain points, since there was no exception saved as to failure to instruct, etc. [State v. Cantlin, 118 Mo. 111, and numerous subsequent cases.]

For the reasons heretofore given, the judgment will be reversed and the defendant discharged. Judge *Gantt* votes for reversal and remanding; Judge *Burgess* concurs in reversal and discharge, but does not concur in sheriff's return having to show he visited residence, etc., and he does not concur in the *"legal curio,"* expression.

### DISSENTING OPINION.

GANTT, J.—In my opinion the judgment must be reversed and the cause remanded because the court erred in the admission and rejection of evidence as pointed out in the opinion. I do not concur in holding there was no evidence upon

which to base the verdict.    In my opinion it is not the province of this court to determine the weight of evidence when there is a conflict of testimony.

It was for the jury who saw the witnesses and heard them deliver their evidence to say whether the prosecutrix was impeached to such an extent that her evidence must be wholly discarded.    Neither do I agree that the return on a subpoena must state that the officer went to the residence of the witness in his efforts to serve the writ.

When he returns that after diligent search he is unable to find the witness in his county it is sufficient and the presumption attending all official conduct is that he has done his duty.    I do not agree to the criticisms upon court or counsel.